## J. S. THORN CO. v. MICHAEL FLYNN MFG. CO. et al.

### No. 9689.

District Court, E. D. Pennsylvania.
March 14, 1938.

Arthur E. Paige and Frank E. Paige, both of Philadelphia, Pa., for plaintiff.

Kennard N. Ware, James D. Howson, and Howson & Howson, all of Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.

This is a suit in equity for the infringement of U. S. Patent No. 1,941,432 to Doering, for a casement window structure, and the issue is chiefly concerned with the operating mechanism at the bottom of the frame, for opening and shutting the window.

Inasmuch as there is a question of the priority of another device involved, it may be noted that the earliest date which can be allowed the patentee for reduction to practice is December, 1930, that the application date of the patent is October 6, 1931, and that it issued December 26, 1933.

Infringement, if the patent is valid, is not seriously disputed and may be found without discussion.

The defense is invalidity—for two reasons. They are:

First, want of invention over the prior art. This defense includes the fact assertion by the defendant that the feature of the patented combination in which, if anywhere, invention is to be found, was first conceived and reduced to practice by a person other than the patentee.

Second, that the patent is an attempt to re-patent an old combination by means of claims in which the only novel feature lies in the improvement of one of its elements.

I have reached the conclusion that the patent is invalid for both reasons.

· The patent has 20 claims, of which 2, 3, 4, 6, 8, 9, 10, 16, 17, and 18 (ten in all) are in suit. All these claims are for the combination described as a "casement window structure." They all contain three major elements, which are: The frame, a window sash mounted on the frame, and operating means by which the sash can be swung outwardly, closed, or held in an intermediate position. There are a number of other minor elements which appear in some of the claims but not in all. These are, an insect screen fitting into the frame, means for detachably securing the screen to the frame, L-shaped members forming the frame and sash, and others, not important.

All but one of the claims in suit describe the principal feature of the sash operating means as primarily consisting of either a crank and handle, or worm gearing, or both. Claims 8, 9 and 10 describe the axis of rotation of the crank as oblique to both vertical and horizontal planes.

Claim 18 describes it as oblique to three planes.

The objects which the patent specification assigns to the alleged invention relate to a field already well covered, and the arguments of counsel credit it with meeting many difficulties of construction which had been met long before its date. The problems of how to open and shut a casement window without removing the insect screen, of doing it by an operating device which goes through the frame below the screen and does not have to intrude into the glass or screen, and of doing it by a rotatable crank mechanism which is self locking and holds the sash in any position, rather than by a push-bar which has to be hooked into notches, had all been satisfactorily worked out in the prior art. Making a unitary construction which could be assembled in the factory, and the reduction of the cost of the whole, were mere matters of manufacture which under no theory required invention.

Even on the plaintiff's own showing, when the patent in suit came into the field there was only one further improvement to be made. In the old structures the crank extended out from the bottom frame of the window parallel and quite close to the window sill. Consequently the handle had to be long enough to extend beyond the sill in order to be turned. So extended, it took up space and made an awkard looking window.

The Doering patent (claim 18) met this difficulty by the very simple expedient of making the crank oblique to the plane of the sill, the plane of the window, and a plane perpendicular to both—that is oblique in three directions. Incidentally, the operator was moved over to the corner of the window. The result was that the sill did not interfere and you could use a very short crank and have a more compact and better looking operator. Every major element of the combination was to be found in the prior art, in combination, and co-operating exactly as in the patent. See admission of counsel as to Exhibit F; also the Watson and the Johnson Patents and the Win-Dor structure. Doering's entire contribution consisted in tilting up the crank and slewing it around a little.

This repositioning of parts did not involve invention. Oblique worm gearing was and had been for years a perfectly familiar mechanical device. Knowledge of it is not confined to engineers and theoreti-

cal experts. Any ordinary mechanic knows that oblique worm gears are made and used and work as well as horizontal ones. Of course, designing the gear and calculating the dimensions of the thread and the precise angles of the gear teeth for a given purpose present problems of mechanical engineering which require special training, but that has nothing to do with the question whether or not the expedient of using an oblique worm would occur to an ordinary skilled mechanic. That question almost answers itself. If you want to get rid of a projecting handle, and you can not shorten the crank and at the same time keep it in the horizontal position in which you find it because of something in the way, it seems obvious that the thing to do is to make it oblique.

It seems a reasonable conclusion that the only thing that delayed this improvement was that it cost a little more to make the operator that way. There may have been some doubt as to the willingness on the part of the public to pay the price, and I suppose architects would hesitate to specify the more expensive operators in moderate price houses.

What has been said would hold good even if Doering's contribution went to the extent of introducing the general idea of using an oblique worm and crank. Actually it is much slighter than that, being confined to the three-way obliqueness described in claim 18. I find as a fact that the idea of using an oblique crank and worm having a two-way obliqueness was conceived and reduced to practice by John V. Eichel, Jr., prior to the date which the plaintiff assigns for Doering's invention. Upon this point the question is entirely one of the credibility of witnesses.

Mr. Eichel testified that in April, 1928, he conceived of and actually constructed a sash operating mechanism actuated by an oblique worm gear. It was oblique in two planes, only, instead of three, but I am unable to see anything patentable in giving the crank the additional slant which it has in Doering's structure. Apart from this, the only difference between Eichel's device and the plaintiff's was that Eichel's gear was internal instead of external as in the plaintiff's. That is, a segment was cut out of the plate whose circular motion moved the sash arm, and the gear teeth were cut in the inside of the partial ring that was left. The diagonal worm passed through the cut-out segment instead of contacting the plate on the outside as in the plaintiff's operator.

Eichel had a great deal of difficulty in finding a practical way to manufacture an internal segmental gear at a reasonable cost, and that, rather than any question of the workability of the device, kept him from putting it on the market earlier than he did, and in fact caused him to withhold it for nearly five years. It had occurred to him that an external worm gear could be used and could be easily enough made, but he wanted to get a device which would be still more compact and would perhaps give him more operating contact surface for the worm and gear.

There was, I find, no abandonment upon his part, but a more or less sustained effort to meet the manufacturing problem arising from the choice of the internal gear arrangement. Even if there had been, it would not have prevented his structure taking its place in the prior art as against the plaintiff's patent. There is a clear distinction between an abandoned experiment and an abandoned invention. Eichel's device was actually made and exhibited to others, and from that time was beyond the experimental stage.

■ I accept Eichel's testimony as true as to all relevant matters, and as establishing the fact that in the Spring of 1928 he conceived and reduced to practice a device which fully anticipated the essential novelty (whether patentable or otherwise) of the plaintiff's patent. My reasons for arriving at this finding are:

(1) Eichel was corroborated at various important points of his narrative by at least six witnesses. Their testimony is to be found in the record of this proceeding and also in the record of an interference proceeding between Eichel and Doering which was offered and is part of the evidence in the present infringement suit.

(2) He was corroborated by documentary evidence, consisting of:

(a) The original drawing made, signed and dated by Crook, an engineer to whom Eichel showed his model and whom he employed to make shop drawings and to design and calculate the best forms and dimensions for the parts.

(b) Letters written in 1928 and 1929 by Stegman, a totally disinterested witness, which refer to his (Stegman's) efforts to locate a machine to cut "the segment internal gear." The existence of Eichel's idea

in its essentials at the time these letters were written is almost a necessary implication from their contents.

(c) Certain blueprints bearing various dates during 1928 taken from fully dimensioned working drawings and showing the device in complete detail. These blueprints were taken from drawings made by Crook in the course of his employment by Eichel. An effort was made by the plaintiff to nullify the evidentiary value of the blueprints, based upon the fact that the tracings from which they were unquestionably made (produced and offered in evidence by the defendant, not the plaintiff) show dates as late as 1931 to 1933. However, I am satisfied that the explanation given by the defendant as to how and why the dates on the tracings were changed from time to time by erasure and the original date not preserved, is perfectly reasonable and credible. While such shop practise might be considered a grave departure from normal in larger and more highly organized firms, it is probably not infrequent in smaller plants where completeness of records and system is often sacrificed to economy. Then too, one would naturally inquire why, if the dates of these blueprints were forgeries, the defendant would produce and offer original tracings bearing dates too late to help his case, when it would have been so much simpler to have made the dates of the tracings and blueprints correspond and all bear the earlier dates. I am also inclined to think that it would be practically impossible to make a blueprint, so that it would bear a different date from the tracing from which it was made without showing evidence of the imposture.

The plaintiff's position is that Eichel did not think of the device until some time after December, 1931, and that it was then really evolved from Doering's structure and a drawing made by one Shartle, an employee of the plaintiff who was loaned to Eichel for a short time early in 1932. In order to accept this theory I should have to find that six or seven witnesses have entered into a conspiracy to destroy the plaintiff's patent by deliberately perjured testimony aided by forged drawings and documents and a counterfeit model.

I would not have had the slightest hesitation in rejecting such a position and accepting the defendant's evidence as the truth, had it not been for an argument advanced by the plaintiff, based upon the identity of certain dimensions in Crook's calculations and Shartle's drawing, which, it was asserted, could not possibly have been arrived at independently. And, since Eichel admittedly had Shartle's drawing at some time, the plaintiff says that Crook must have copied from Shartle and dated the whole procedure back three years. This argument is summed up in the Plaintiff's reply brief where he says that the defendant "now asks Your Honor to believe, with reference to Defendant's blue-print Exhibit P, that on the 8th day of the 8th month of 1928, more than four years before Mr. Shartle made his drawing for Eichel displaying those dimensions of the worm design which he had originated, Mr. Crook had made his drawing No. 90, Defendant's Exhibit O, anticipating with prophetic accuracy to the ten-thousandth part of an inch the peculiar dimensions of Shartle's worm, which are inconsistent with any accepted rule of design for such a worm."

To me, a layman with little knowledge of the mechanical principles and practice, this argument seemed to have great force, since there are certain dimensions which do correspond to the ten-thousandth part of an inch. I therefore obtained the agreement of both parties to employ an independent expert mechanical engineer with special knowledge and experience with gearing, to advise me as to its validity.

Without going at length into a discussion of the technical details of engineering practise involved, it is sufficient to say that, while there are a number of similarities, most of these represent dimensions which might easily have been arrived at independently and that, except for the similarity in one dimension (.1094" or 7/64", being the whole depth of the worm thread in Crook's drawings), there is no basis in the table for the conclusion that either party obtained information from the other. Parenthetically, it will be noted that the other correspondence which seems remarkable (.0487", the addendum) follows mathematically from that just mentioned provided the same clearance for the thread is taken, and that the .012" clearance is by no means uncommon. It is pointed out that the use of the dimension just mentioned (.1094") by Shartle was for the gear tooth, while Crook used it for the worm thread. So used by Shartle, it makes a highly undesirable, although not necessarily unworkable combination. In Crook's drawings it is good practise. The conclusion is that if

there was any copying done, it is much more likely that Shartle, rather unintelligently, copied this dimension from Crook than that Crook copied it from Shartle. It is a fact that Eichel did give Shartle certain general instructions as to dimensions, etc., though it does not appear that he furnished him with Crook's drawings. The series of calculations and drawings made by Crook with the changes which appear in them from time to time, show an entirely reasonable and probable evolution in working out the idea. For example, he began with 5/64" thread, later decided it was too shallow, and changed it to 7/64". Other changes followed naturally.

The net result is that plaintiff's argument based on the similarity of certain dimensions does not disturb the conclusion arrived at as to the truth of Eichel's testimony.

The second reason advanced by the defendant for the invalidity of the patent is, I think, also sound. All of Doering's claims cover a combination which includes the elements of window-frame, sash and operator, and many of them contain other elements. The invention, if any, consisted merely in the improvement of one of these elements—the operator. If there were some new functional relationship between the operator and the other parts of the structure, it would be permissible to claim the entire combination. There is, however, no new mode of cooperation involved. The function of the operator of Doering's patent is to open and close the sash and hold it in intermediate positions. So far as its effect upon the movement and position of the sash is concerned, it performs its function in exactly the same manner as the operators of the prior art. What has been done is merely to put the handle of the crank by which it is worked in a more advantageous position, not so much for its use as for the appearance and the convenience of the room. This is nothing more than an improvement in one of the elements of a combination which does not in the slightest degree change the coaction of the parts of the whole. The claim is clearly much broader than the invention. That such a claim is invalid has been held many times. Langan v. Warren Axe & Tool Co., 3 Cir., 184 F. 720; McGrath Holding Corporation v. Anzell, 2 Cir., 58 F.2d 205; In re Germantown Trust Company, Cust. & Pat. App., 57 F.2d 365; In re Ratican, 36 App.D.C. 95.

Statements of fact and law in this opinion may be taken as specific findings and conclusions under Equity Rule 70½, 28 U. S.C.A. following section 723.

The bill may be dismissed with costs.